Welcome to the Court of Appeals. We'll begin by hearing the first case, which is the Salinas case. We'll hear from the appellants. One day I think we'll probably put signs as to where people sit. Sometimes the appellant is here, sometimes the appellant is there. Yeah, I was a little confused myself. Proceed, please. Good morning, Your Honors. May it please the Court. This case comes before the Court on de novo review, and appellants are entitled to judgment against commercial interiors because commercial interiors employed them under the Fair Labor Standards Act. This Court should reverse because the lower court analyzed commercial's liability under the Fair Labor Standards Act using a set of factors that is unmoored from the statutory language, its purposes, and the definitive interpretation. Under the Fair Labor Standards Act, a business is jointly liable for wage violations felt by workers in its operations where the circumstances reveal that that business had the power to detect and prevent the violations. The standard is far broader than the common law standard, but it stops short of strict liability. The Supreme Court instructed in Rutherford Foods that examination of liability under the Fair Labor Standards Act is determined by references to the circumstances of the whole activity. Examination of the relevant circumstances, such as whether there was a discrete job, whether who supplied the tools and the premises, the level of supervision, examination of those circumstances reveals whether the work was sufficiently integrated into the business operation to such a degree that that business can fairly be held liable for employing the workers who performed it. Lay out, if you will, the structure of the analysis for these type of cases that you would propose. Absolutely. Different circuits have looked at them differently. Judge Marks employed his own test of sort. And the Fourth Circuit has really not laid out the kind of structure that these cases would inform how to handle these cases. Right. So under the Fair Labor Standards Act, as I was saying, it's much broader than the common law, but stops short of strict liability standard. And the sort of touchstone of the analysis under the Fair Labor Standards Act is the power to prevent and detect violations. And that comes from both the statutory language and the Rutherford Foods case. I'm not looking for the philosophical basis or other reasons, but I'm just telling you, asking procedurally how would you. For instance, I'm curious as to whether in terms of structurally, should we first determine there's a joint employee relationship? And if in doing so, how then do we do that? And if we determine there is such a relationship, then we move into the second part of it, which deals with the independent contractor-employee relationship, that type of relationship. Right. Which the cases sort of inform that's the way to go. Yes. But in terms of the actual test and the factors to use in it, we've really not articulated that. Sure. And I think the actual test and the factors to be used are derived from the Rutherford framework, whether it was a discrete job, who supplied the tools and the premises, what was the nature and degree of supervision, whether they used the same contracts over and over again. And those are really the factors that both the Second Circuit and the Seventh Circuit have looked to in the Barfield and the Reyes cases. In other words, can we just say that we would apply the real economic reality test? Absolutely. As long as it's clear that real economic realities test is derived from Rutherford and the statutory language. The lower court, what the lower court did here was apply a series of factors that really look to the legitimacy of the contracting relationship and whether what the intent of the parties was. And those sorts of considerations are not material to the Fair Labor Standards Act analysis. As the Supreme Court has said repeatedly, the Fair Labor Standards Act is intended to codify industry standards. And where Congress wanted to make an intent-based standard, it knew how to. Counsel, how does your approach differ from Department of Labor's? I mean, you're asking for something other than we should adopt the Department of Labor list of factors, right? Right. Well, I think that the Department of Labor's list of factors is not inconsistent with our standard. Our standard simply hews more directly to the statutory language and the Rutherford analysis. In Rutherford, the court developed this set of factors that looks to the degree of integration and said that sufferer permit is derived from the child labor laws. And traditionally, that means the power to prevent and detect. So our analysis hews more closely to that. I think their analysis is a little bit broader and focuses more on whether the worker was dependent on, economically dependent on that business. I believe that analysis has been developed through different circuits in the courts, but it was originally derived from Social Security Act cases, not Fair Labor Standards. Seasonal Agricultural Workers Protection Act, that list of factors. Are we talking about the seven factors? Yes, yes, the seven factors that the Department of Labor. That's from their regulation of the migrant workers, which use the same definitions as the Labor Standards Act. Well, it puts in some other control factors. And I guess my question about your approach, which I totally understand, it's sort of the Rutherford integration inquiry. But what happens? I mean, is it possible that there is a case where the job is actually not particularly integrated into the main economic sort of mission of the putative employer, but there is still a fair bit of control? And what do you do with a case like that? What if Commercial had hired a bookkeeper from an employment agency, an accounting agency, and so it was not installing drywall, it was not integrated into the main function of the company, but they were sort of standing over her desk making sure she was working the right hours, correcting her work. What do you do then? Well, so I think that the common law factors would essentially kick in then because they would also most likely be keeping track of her payroll and in charge of her working conditions. So she would still meet the common law test of employment, and you wouldn't even necessarily need to go on to the broader spectrum. We think that the DOL factors be understood as sort of a combination of your integration test plus the control factors. Yeah, and I think the way that the DOL has described it is their test sort of incorporates both horizontal and vertical joint employment analysis, and our case is specifically about the vertical integration analysis. So here it's quite clear that the appellants were doing the same exact work as commercial interiors, direct employees did. They were operating under the daily correction and inspection of commercial interiors. Let me ask you, this is an area we don't have in that much, but it is very important for your expertise. In the regulation 791.2b, there are three non-exhaustive situations in which you classify a person as a joint employer. Which of those three do you maintain applicable in this situation? Well, honestly, I think this case fits into all three, but the third one is the one that we think is the strongest, because there's ample evidence here that commercial and J.I., the subcontractor defendants, were not completely disassociated. And in fact, J.I. was essentially working for and in the interest of commercial interiors. I mean, 12 of their 14 contracts were with commercial interiors, and that sort of degree of dependence of one business on another was recognized by the Second Circuit in Jiang as suggestive of joint employment. But again, here, that's not even the only factor. I mean, this case is very similar to some of the labor broker cases, like the Reyes case out of the Seventh Circuit, where Judge Easterbrook said, look, if you hire basically a labor force to come and work for you, then that's far different from hiring someone to provide a discrete product and a finished product. That's why I asked you at the beginning how structurally we should begin this, because if you start this discussion, you can end up talking department factors, you can go into the independent contractor test, and you're all over the place. And what I'm structurally trying to establish is if your argument would go first and say here's the reason for their joint employment, if they are there, then we now discuss whether there's an independent employee relationship here, and then move the analysis in that way. And it sort of structurally follows, because you used the word factor right there instead of situation. And there are so many factors in this thing. Every court has come up with factors. Even Judge March came up with a bunch of factors. Right. Well, I mean, it does – I think the Fair Labor Standards Act recognizes a spectrum of employee statuses, right? So you can go from common law all the way out to independent contractors. But the scope of the Fair Labor Standards Act doesn't incorporate the independent contractors. It stops short of that. And so I think, you know, the issue with the regulations is that this case fits the regulations, but they're not particularly illuminating. They give exemplars, and one of them is the very definition of employer. So what we need is a standard of how to analyze these. And Rutherford – the Rutherford framework, as the Second Circuit and the Seventh Circuit have shown, is the framework to follow in deciding this type of issue. Can I just – no, I'm getting confused. There's no question – no one is arguing in this case, right, that the plaintiffs are actually themselves independent contractors. No, absolutely not. Right? No, no. I didn't mean to confuse you. And the only question is, do they have one employer or two employers?  Absolutely. I was just saying – No, I just wanted to make sure I understood. Yeah. Absolutely. I believe I'm into my rebuttal time, so I would like to – All right. Looks like we've exceeded some time. Over to the amicus. Thank you. May it please the Court. My name is Dean Romheld. I'm here on behalf of the Department of Labor in support of the plaintiffs' appellants. We are amicus in support of them. Just to follow up on the last issue that was raised – I think a little recommendation should be entitled to some form of Skidmore deference. We do believe that the Administrator's interpretation that the Department issued earlier this year addressing joint employment should be entitled to some deference under Skidmore. We believe it has the power to persuade. And this Court has given deference to similar sorts of guidance memorandum the Department's issued in the past. So, yes, we do believe that it has that persuasive force. Just addressing the independent contractor issue. There is, in this case, no allegation of any independent contractor relationship. The employees here are – the workers here are employees of JI. And the issue is whether they're also employed by Commercial Interiors. There may be cases where there may – that may be a possibility where there may be an independent contractor relationship and a different structure. Both sides are agreeing that we need not engage in employee independent contractor analysis because everybody agrees that this person – that they were employees of both. I think there's no – first of all, there's no allegation. I'm not aware of any evidence that would support the argument that these are drywall workers who – there's no evidence they have an opportunity for profit or loss. There's no evidence that they engage in any sort of managerial skill. Those, as this Court – those are some of the hallmarks of being independent contractors. So, help me out. Is the question – it seems like to me it's fairly obvious that they're employees of JI. Right. But the question is, are they employees of the commercial? Right. That is the question. So, I thought that's what the analysis is about. I mean, everybody's probably going to agree they're probably JI, but I'm going to be interested to see if the other side gets up and says, oh, they're employees also of commercial. They will not say that. Well, isn't that – No, that is exactly the question. That's exactly – That's what I was going to say. That's exactly the issue here. I think the point is that the independent contractor analysis – the particular economic realities factors that this Court has employed in an independent contractor analysis aren't particularly relevant or helpful here. It's the Department's position that the MISPA – the factors that are laid out in the Department's regulation discussing joint employment under MISPA are the factors that this Court should use as guidance to develop an analysis in this case. And there is obviously a little bit of difference between the specific approach that the plaintiff's appellants have argued for and the specific approach that we argue for. But there is much more overlap between the factors. Both sets of analyses will look at control. They will look at where the work is performed. They will look at whether that work is integrated into the unit of the business of the potential joint employer. And they will also look at the duration of the relationship between the workers and the potential joint employer. But there is such a vast difference between the set of factors in the analysis that the District Court employed and, on this side, the economic realities analysis that both plaintiffs' appellants and the Department are urging that this Court apply. Can I ask you a question about sort of your list of factors? Because the thing I am having trouble with is we can't just apply factors in a vacuum, right? We have to know what it is that they're testing for to make sense of them. And you say that all of your factors are sort of designed to get at this question of economic dependence. Correct. But I don't understand that. Like, I get it when the factor is does the putative employer have control over hiring and firing. That seems to go to – Right. But things like whether the job is sort of integral, I mean, let me be really specific. It seems to me highly relevant that the plaintiffs in this case wear the helmets and the vests and have the ID cards all labeled commercial. That seems like it's relevant as to whether or not they are actually employed by commercial. But I don't see what that has to do with economic dependence. Well, I mean, just going through the factors, first of all, I agree that those facts that you identified are indicative of joint employment and tend to show joint employment. It seems to show sort of an integration. Right. But I don't understand the connection between integration and economic dependence, I guess. Right. I mean, to the extent that the work is actually a part of the business that the potential joint employer is in business to provide, the role of those workers are more involved and tend to show some sort of dependence. Why does it show dependence? I mean, assuming for a minute that there's no actual, you know, the employer can't fire you, can't dock your hours, isn't in control of your pay, in what sense are you dependent on them just because you're integrated into their workforce? I think you're dependent on them in that particular circumstance. It's because you're doing something that the potential joint employer. It seems like they're dependent on you. Well, you're depending on them for the work would be dependent on them for the work because it's particularly integrated. It's not something that's peripheral to the potential joint employer's business. It's not something that it's, you know, easier for them to either outsource or move out. I mean, they are working, in this case, the drywall workers are working side by side with commercials employees, you know, engaging in that drywall work. But the other factors, too, I mean, to the extent that there's more of a permanent or longer term relationship, I think that shows dependence. The extent that the services are performed on the premises using the equipment, again, I think that goes to the economic dependence. The extent that the work is rote and repetitive, I mean, that suggests a dependence on the particular business that the work is being performed for. Let me ask, at least again, for a clarification. Yeah. The Shoals case seems to indicate you first ought to determine whether there is a joint employment. Right. Before you even get into an analysis of whether there's an independent employee relationship. Do you agree or disagree with that? I think in some case. Sorry, what case? The Shoals case. The Shoals case. The Shoals case. Well, yeah, but in that case, I think there was an allegation. The reason it says it, how in the world are you going to determine this employee or independent contract if you don't know the nature of the joint employment? I just agree that that was the correct analysis in that particular case. That is the analysis. Your factors, do they go toward the joint employment? Which it seems to me, that's where your factors go to. And then when you're looking at the employee in terms of whether they're employee or independent, you look at the Silk factors. Here, in this particular case, given the facts of this case. Don't confuse me on that. I will try. I'll show you all these factors out there. And if you don't structure this thing, you're all over the place. In this particular case, that two-step analysis that was performed in the Shoals case is unnecessary. The workers here are not in business for themselves. How does this work? It works if you first determine if it's a joint employment. And then you use your factors to determine there. Then you slide in to see, well, is it an employee independent analysis? And use the Silk factors. Why does that not work? And it's a good way to do it. What I'm saying is that the second part of the analysis is not necessary. And the first part of the Shoals analysis, which focused on joint employment, the joint employment situation in that particular case fell into a different box within the FLSA reg. In that case, the joint employment analysis was built on the association and sort of shared control, shared management of the workers. Here, in our view, this is a three situations under the non-exhaustive list of the 791.2b. Does this fit? In the interest, J.I. is acting in the interest of commercial by providing them with labor. And in those particular cases, Which of the three? That's the second one. That's the second one, yes. You say second, and the other side said it was more likely the third. Again, there is some divergence between our views and their views, but there is not that much divergence. May I finish my time? Please. Yeah. The exact factual scenario that exists here is addressed by the department in its MISPA regs. MISPA and FLSA share the same statutory definition of employee, as this court has recognized in Howard v. Malcolm. The scope of that employment relationship is the same. And it's our position that the court should adopt the seven factors outlined in the MISPA reg to determine whether the workers here are jointly employed by commercial. And we think, obviously, that's a non-exhaustive list to the extent that there are other factors that are consistent with the economic realities of the relationship and that go towards economic dependence. Certainly, those factors may be considered, too. And those factors overlap tremendously with the factors that are laid out. In your mind, how does this FLSA reg, 791.2, how does that relate to the factors? Do we apply both? I thought that you thought that 791.2 was only relevant when we were talking about horizontal joint employment and that this was a vertical case. I think that's largely correct. But I think that the FLSA reg provides broadly situations where joint employment exists. You think it does apply here? The second situation is sort of the bucket, for lack of a better word, in which this situation applies. But the department at reg has not fleshed out what exactly that means. And in a more recent rulemaking effort and in a rulemaking effort under the exact same statutory framework, the department has fleshed it out and explained what factors we should apply. Should there be a presumption of some sort if it was either under number one agreement or three? I mean, it seems like if you were to determine if either of those two non-exhaustive factors, why do you need additional factors? To the extent that the court feels that the circumstance here fits into one of the other buckets than two, then that obviously would be a basis for finding that there's joint employment here. Our reading of the facts as the district court found them suggests that commercial, that JI was acting in the interest of commercial by providing it with laborers. That was what it was engaged to do, simply provide it with laborers. And that's the category within 791.2 that we feel fits best. Obviously, if the situation, the facts, satisfy another category, then there may be another alternative basis for joint employment. All right. Thank you for your time. Thank you. I appreciate the extra time. We'll hear from the attorney. Good morning, ma'am. Please, go ahead. At the outset, I'd like to talk about what this case is and what it's not. This is absolutely not a case where the individual workers are claimed to be individual independent contractors. We have, out there in the working world, situations where guys try to structure things. Every guy's a 1099, so they don't have to do withholding on them, so they can pay them what they want. But the analysis that SHOPES wants us to do, and that is determine whether there is a joint employment here. That is the issue of this case. My point is this is not the individual workers as independent contractors, which invokes the SILK analysis. If you're trying to determine if they're independent, then you go to SILK. That's not this case. I would say we don't need to do SILK. What this case is and what this case is not, also. This is not a labor broker case. There are guys out there, particularly in the agricultural industry, which the migrant workers statute kicks in on. It happens in the construction industry, too, where a guy goes down to the Home Depot with a pickup truck and finds six guys who look like him. They hop in the truck and he takes them out and he delivers them to an employer and says, here they are, you pay me by the body by the hour. That's not this. These workers involved here are real live employees of a real live subcontractor, J.I. The relationship between J.I. and commercial is a real live subcontract, fixed price subcontract relationship. J.I. contracted on all of these projects with commercial to perform a defined scope of work for a fixed price. Negotiated between the two parties, just like commercial on each of these projects was a subcontractor to someone else under a defined scope of work for a fixed price. That, I think, frames and necessarily frames our discussion and the analysis the court needs to look at in this case. This is a legitimate subcontract relationship. This is not some of the outliers that you will see in some of the cases and see out in the world. This was not furnish me, give me 20 guys and I'll put them to work. This was you, J.I., will perform this work. If you perform it efficiently, then the owners of J.I. are going to make a lot of money. If they don't perform it efficiently, they're not going to make so much money. You know, that's kind of the approach the judge took. That is, let's see if this thing fits under the FLSA. It is. It is. And I'm not so sure that's the direction it shows, which is the full circuit case here. Hear me out on this. Yes. Because I think the cases, even Rutherford, first approached this from the perspective of, is this a joint employment relationship? And in doing that, what are the factors that we're going to employ to determine if that employment relationship exists here? And rather than start from the, well, is it outside of the FLSA, the question is, is there a joint employment type relationship? And so what do you propose the factors to determine that would be? Well, the courts around the country, the various circuits and certainly the various district courts, seem to like the four factors of Bonnet frequently linked with the three factors of Zank. They're not always called that. The Eleventh Circuit has a case laden, cited in the DOL brief, not in ours, unfortunately, because it's a really case appropriate here. But they don't call them, they don't name them Bonnet and Zank, but they use the same seven factors. Judge Motz, in his prior opinion in Jacobson Comcast, used those seven factors, and he referenced Jacobson Comcast in this. But he didn't apply those factors in this case, right? I don't know that I can get inside Judge Motz's head on this. I'm not asking you to get inside his head. I'm just looking at the opinion. I mean, we can certainly get inside what he wrote down. He does cite Jacobson Comcast. He made up some facts. Well, I'm not sure what he did. You're doing de novo reviews, so I would suggest that what Judge Motz did, frankly, is relevant. Well, that's a de novo review for the look right at what those factors are he gave, and the ones that exist previously in the Eleventh Circuit. I mean, it's pretty easy to see they're different. Well, I don't agree that they're necessarily different. Well, they are hybrid. Maybe that's the case. Maybe it is. Butler says that the hybrid does not apply in the FFL case. I think that's the Title VII case. I'm glad you said that because I was wondering that myself, but we'll find out more. I think footnote number 20-something or other says exactly that. This is the Title VII and FLSA. Isn't the problem the reason the standard is different is because the definition of employment in the FLSA is so incredibly broad, right, to suffer or permit to work. That's very different from kind of lack of language in Title VII. That's why we thought that the test would be much broader under the FLSA. Well, I don't know that I can comment to discuss nuances of Title VII versus FLSA. FLSA is reasonably broad. Suffer or permit to work is reasonably broad. But the language is so broad that it means nothing unless brought back to real facts. Isn't what you bring it back to, right, if you read it absolutely literally, it's going to cover real independent contractor kind of relationships for someone. I can't remember what the example they used was in Rays, but like the plumber comes to fix the bathroom or the employee restroom, and it's obviously not supposed to cover that. But that's sort of the way the court described it in Rays I think was sort of an independent contractor comes in, does one discreet job that has really nothing to do with the economic mission of the putative employer, and then leaves. That is not very much like what we have here. Well, but you can't limit it to just that. That is an obvious example. Well, why not? Isn't that a good way to think about this incredibly broad language that you obviously can't read so literally that it covers the plumber, but it probably ought to cover just about everyone else. Well, I would hope not. That's not the intention. Well, why do you think they picked that very, very broad language? According to legislative history, which is for whatever use the court assigns to it or not, it was a product of the economic times. We're coming out of the child labor scandals. We had no minimum wage shortly before this. We had no overtime legislation prior to this. You're trying to overcome the sweatshop situation. We're way past that, I would respectfully suggest. This is the next century. Times have changed. The analysis still works, but you can't take it and say suffer or permit to work. I'm working here right now. You, frankly, are suffering or permitting me to work. Well, hopefully not suffering, but you are permitting me to work. You're not my employer. Economic dependence. I may have a client who gives me a lot of work. I'm economically dependent upon them. They take that work away, I'm hurting under that scenario. They're not my employer. So you can't just take the broad words and say. If you want broad words, D.C. recently has just enacted a statute that says on a construction project, the general contractor is responsible for the payment of all wages for everyone who works on the job. That's broad. The FLSA looks pretty limited when you compare it to that. And the FLSA, clearly, you wouldn't have to go through all these gyrations that the courts have gone through. We wouldn't have to look at seven factors. We wouldn't have to look at four factors of Bonnet. We wouldn't have to look at three factors of Zeng if it were simply you let me work, therefore you're reliable. That's not where it's intended to go. The reality of this situation is that unless one is going to determine and hold that everybody in the food chain, everyone at the top of the food chain on down to the bottom of the food chain, is responsible for the payment of wages of everybody in that chain, then you have to make some distinctions. And the courts have made those distinctions. They made them in Bonnet. They made them in Layton. They made them in all the district court cases, which there are an abundance in this circuit, many of them out of Maryland, for whatever reason. There are distinctions to be made. It's not simply a, well, you let me work, therefore you're reliable. That's never been the law. The practice that the department proposes for establishing joint employment relationships, do you lose? No, I don't. Tell me how those factors work in such that they still work in your case. I'll do my best. Frankly, the concepts of the enunciated are pretty abstract, and I don't do too good at abstract. I do better at concrete. The number one, an arrangement between the- Abstract is more fun. You get to play around with it a little bit. You do get to play around. I think that we're deciding, and it's a de novo review on summary judgments. I would suggest that it's absolutely fact-driven, fact-related. It's got to tie back to the facts of the case, but obviously the courts will decide how to approach it. Number one, arrangement to share the employee services. There's no arrangement to share services here. These guys are employees of J.I. They're doing work for J.I. under a subcontract between J.I. and commercial. Acting directly or indirectly in the interest of the other employer. I frankly don't know what that means. I would hope that the subcontractor is acting in the interest of the contractor next, just like commercial is acting to some degree in the interest of the general contractor with whom they're contracted, just like Whiting-Turner or Clark Construction or whoever the general contractor is, is acting in the interest of the owner. I mean, one of these projects, we had Sinai Hospital. We had the Wounded Warrior Center at Walter Reed. We had a dormitory building at Salisbury University. We're all acting in the interest of the owner. That's the nature of the construction business. It comes down, but there has never been a situation where any court, to my knowledge, has enunciated a principle that from the top on down, the principle would have to go all the way to the project owner. They own the premises. The work is done ultimately for their benefit. It is contracted to them. Without their blood in the contract, there is no project. There is no work. Which factors are you going through? You're not going through the... You're looking at a non-existent list of factors. That comes directly from the statute, 791.2. We're talking about the seven that the Department of Labor has set forth. I'm sorry. In the amicus brief, it comes essentially from the minor seasonal agricultural workers protection act. Yes, okay. I thought you were referring to 791. Those are not so abstract. Those are pretty direct. It starts off right there. It says, is the employer directing, controlling, or supervising the workers? Pretty straight up. And those are the factors, by and large, on that exact. The first seven of them here, and that's why I asked, if you apply these seven here, how does that affect your case? Okay. If you go to ability to hire and fire, that's fine. We can use that analysis. It's perfectly purposeful. It's been used by many of the courts. Without referencing the Migrant Workers Act, which these are migrant workers, so I'd suggest it doesn't apply. But you can use the same criteria. Well, that Migrant Workers Act has been held to be essentially the same definition of employees as the federal FLSA. Actually, maybe so, although I know the 11th Circuit in Layton said that they're not the same and, indeed, refused to apply the factors. I'm only just going by the statute here, 29 U.S.C. 18025, which defines employer. Let me address what the 11th Circuit said, which we're not bound by the 11th Circuit. Let me talk about the factors, if you'd like. Hire and fire. The hiring was done here by J.I. There's no evidence that the commercial had anything to do with hiring of the J.I. employees. They certainly didn't fire anyone. They had no power to do either. Supervise. The evidence is the commercial did not supervise the J.I. employees within the meaning of the factors or the statute or the regulations. Hang on. Hang on. I thought that, is there not this morning meeting at the beginning of the day? Some mornings there is a toolbox meeting, yes. Here's what we're doing today. Right. Well, that seems okay. And then do they not monitor their work throughout the day? They monitor the performance of the work as any contractor has to. The contractor has the obligation to deliver a product to the employer. And they give immediate feedback if there's a problem? I don't think there's any evidence of that. Well, what happens if they see a problem? What do they do? The evidence is they would tell the J.I. supervisor that your guys need to be fixed. So there's some supervision. There's supervision of the work. The case law is very clear. I'm just saying I don't think you can blow through that factor quite so quickly. I understand your argument. We only have 20 minutes, Judge. Well, your green light is still on, so let's go through the factors. This is pretty much the crux of your case, right? I'm happy to address. The case law is very clear. There are numerous cases that say quality control is not supervision that gets you joint employment. You don't even need the cases. The factor itself says that you take account of the nature of the work performed in a reasonable degree of contract performance oversight. So it's right in the factor. That's good. Quality control does not make you the joint employer. It didn't with Moreau, the servicing of the planes. It hasn't with Zhang. It hasn't with numerous. All the cases aside. That's a really interesting question, the quality control thing. Because usually I think what the cases have in mind, what this factor has in mind, is that you check the output. And the question is whether there's more sort of input control here. It's not just that at the end of the day they go through and make sure everything got done right. It's that they start with this morning meeting. They tell people do this, do that. They sort of look over their shoulders as they're doing it and whether that's really quality control or something more like direct supervision. Well, it wasn't direct supervision here for one basic fundamental reason. The evidence is that the commercial superintendent on the job site didn't speak any Spanish. And the evidence is that none of the employees of J.I. spoke any English whatsoever. So you've got a real threshold issue of you can't very well supervise someone you can't talk to. What happened at the morning meetings? Apparently they talked to the supervisors for J.I. Those are the facts in the record. And you're doing a de novo review. And I also would urge the court, as I'm sure would, to take note that Judge Mott stated the facts, in his opinion, far more favorably to the plaintiffs than the record support. Hopefully we've done a good job of referring you back in the brief to the facts in the record. He did, but what we are interested here has to do with something he did not state. That is the seven-factor test I asked you to look at and prepare this analysis. So he did it with his own test. That's all well and good, but we want to look at this particular test. Absolutely. Determine rate and method of payment. The commercial did not determine the rate of pay. The rate of pay, the evidence was, was negotiated by the J.I. workers with the J.I. supervisors, the owner of J.I., when they hired them. Except on prevailing wage jobs where the Department of Labor sets the wage rate that they will be paid based on their job classification. The commercial did not pay the workers. J.I. paid the workers with J.I. paychecks. Who set the work hours? I think, is there, I want to make sure I'm not getting my cases mixed up, but is there an allegation in this case that it was commercial who would require, sort of directly require that plaintiffs work on Saturdays and do overtime work? There's an allegation. There's no evidence to support that. And, in fact, the reality of the construction site is the job hours are set by the general contractor and they flow down from there. They don't come from an intermediate subcontractor or any kind of construction project of which I'm ever, have ever been aware. And that was the case here. But would you agree that that is a material fact in trying to figure out who the employer is here? It could be under some circumstances. I would say generally in the construction context, not really. Who cares if you, if it doesn't make you an employee if you say 7.30 to 3.00 versus 7.00 to 2.30. I don't see the difference. But that wasn't the case here. It does seem like in an FLSA case when you're worried about overtime, there might be some importance attached to the question of who's making the person work overtime. I would agree with that. I would suggest that's a different question than the work hours, as I understood your initial question to be. If a contractor upstream is going to the works and saying, you've been here for eight and a half with the lunch hour, with the lunch half hour, but you're staying for another two, that's control, or at least arguably control. But we don't have that here. Is there not an allegation of that here? There is an allegation. We're not dealing with allegations. We have a developed record. We have a developed record. Your contention is that there is no dispute of fact on that. You believe that the record does not put that fact into dispute. I do agree. But you agree that it wouldn't be a material fact if it were in dispute. I do agree, and I believe the plaintiffs agree as well. If you read their brief, they do not identify any. They don't make the contention there are any material facts in dispute, and they don't list any or identify any if they don't, in fact, believe that. Well, is it your position, you started out by saying this is a finite contract. Yes. And so, therefore, because it is a finite contract, the FLSA cannot apply to you in this case. Is that your simple position? No, I don't think. I hope that's not what I said. What I said was, what I intended to say, what I meant was, what I hope I said was that the fixed price contract distinguishes this situation from the buying late, the labor broker situation where somebody delivers 20 guys a job and the guy gets paid so many dollars an hour for them. Whether they sit there and do nothing or whether they work real hard, this is a, J.I. is a business in business for itself. It makes a profit. It makes a profit if it does good work efficiently. It has made a profit. It was in business for some 13 years at the time we were coming up on this and had done quite well. It turned a nice income to its owners. But the distinction I was attempting to make was that this means it's not a labor broker situation because the labor broker situation, in my mind, is different. Just like an independent contractor, individual workers as independent contractors is a different situation. I think the law supports that those are different situations. I have not made it up through all the seven factors. I'll continue if the floor wishes, although my time is up. That's fine. Thank you, Mr. Jack. You have just a few minutes for? Yes, thank you. I only have a few points to make. First, with respect to the contracts, the commercial admitted in its brief and the joint appendix shows that these were contracts for labor only. So if you look, for instance, at the joint appendix 126, this project scope agreement says, provide us with labor to perform the following work according to our timetables. So try, as you will, to distinguish this from a day laborer case. It's not substantially different. Can you just give me that citation again? It's at the joint appendix 126 at the top of the project scope agreement. And it does list the work that they performed, but the contracts can't overcome what happened as a practical matter. And as a practical matter, and the record shows, Your Honor, Judge Harris, you were right, that there were morning meetings at which there was instructions provided. And whether or not they were provided in English or whether the J.I. Foreman served as translators doesn't refute the fact that it was commercial who was calling the shots here. So the J.I. Foreman were nothing more than working foreman for commercial. They wore commercial interior sweatshirts. They worked alongside the drywallers hanging drywall the same way all the other laborers did. So the mere fact of translating the instructions, it's like saying, you know, someone who does sign language is actually in control of the decisions made. I would also point out that J.I. There's very clear evidence that J.I. adjusted its staffing levels to meet commercial's needs. Commercial superintendent determined based on feedback from its foreman how many people they needed on jobs and relayed that to the J.I. subcontractor defendants who then sent the number of people. One of their foremen even said, you know, if I needed an extra guy, I would get it from J.I. So this was clearly a situation where the only thing that J.I. was supplying was the labor. And in terms of giving the daily assignments, Neil Malin, who is one of the commercial interiors foreman, testified at Joint Appendix 307 that he gave daily assignments at his direction. Yes, he said he gave them to Wanner, Isaias, Flores, Ramirez, who then translated the directions to the workers. In terms of quality control and supervision, their corporate designee testified that his foreman, their job is to go back and forth all day, every day, inspecting and correcting the work as it's performed. And the Ninth Circuit in Torres Lopez, you know, distinguished where you accept a finished product, like a working elevator or a legal brief, from the ability to inspect and review the work as it's happening. And Torres Lopez noted that that sort of on-the-ground supervision as the work is being performed is relevant to joint employment and suggestive of joint employment. Thank you very much for your argument. Court appreciates the argument of all counsel. We will come down and greet the counsel and then proceed to the next case.
judges: James A. Wynn Jr., Henry F. Floyd, Pamela A. Harris